**GULF PUERTO RICO LINES, INC.,**
Plaintiff,

v.

**ASSOCIATED FOOD CO., INC.,**
Defendant.

**Civ. No. 547–70.**

United States District Court,
D. Puerto Rico.

Oct. 30, 1973.

**632**

———————◆———————

Jiménez & Fusté, San Juan, P. R., for plaintiff.

Joseph W. Kiefer, Santurce, P. R., for defendant.

## FNDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

PESQUERA, District Judge.

Cargo that is to be carried on an ocean voyage is prepared for shipment to protect it from the perils of a sea voyage; to utilize efficiently the cubic capacity of the carrying vessel; to facilitate its handling at the ports of loading and unloading, thereby decreasing the time necessary for its door-to-door movement; to prevent pilferage; and to reduce and simplify the paper work involved, thereby facilitating trade and credit transactions.

The accommodation between the ideal stowage that would perfectly protect the goods but at the same time would prohibitively increase freight charges, and the complete disregard of the safety of the goods for the convenience and profit of the ship owner, becomes the trade standard for the carriage of each particular type or kind of cargo. Bache v. Silver Line Ltd., 110 F.2d 60, 62 (2nd Cir. 1940). It is axiomatic that both the shipping and vessel interests are vigilant to improve this trade standard and thereby reduce insurance premiums, lower freight rates, increase trade and raise profits.

This case brings before the Court the question if in light of the transition in the methods of cargo carriage from the traditional break-bulk operations to the now sophisticated containerization services available throughout the world, demurrage is to be considered a continuation of freight and within the admiralty and maritime jurisdiction of this Court. See in general, in respect to containerization and its problems, Bissell, The Operational Realities of Containerization and Its Effect on the "Package Limitation" and the "On Deck" Prohibition: Review and Suggestions, 45 Tul.L.Rev. 902 (1971); C. Eugene Spitz, Cargo Risk Problems—Container Operator's Dilemma, 45 Tul.L.Rev. 925; Rose Lucchese v. Malabé Shipping Co., Inc. and Sea-Land Service, Inc., et al., 351 F. Supp. 588 (Dist.Ct.P.R.1973); Schmeltzer & Peavy, Prospects and Problems of the Container Revolution, 1 Journal of Maritime Law and Commerce, 203 (1970).

This case was tried before the Court without a jury on March 12, 1973. The plaintiff, Gulf Puerto Rico Lines, presented for admission in evidence, and the Court admitted, Exhibits 1 through 8, which correspond to eight movements of cargo from the United States to San Juan, Puerto Rico, involving the defendant, Associated Food Co., Inc. The Court also admitted as Exhibit 9, a pulled-and-arrival report prepared in the ordinary course of business showing the

dates on which certain trailers referred to in Exhibits 1 to 8 were returned to pier facilities which will be mentioned or described hereinafter; Exhibit 10, which is a blank form of the trailer interchange receipt and inspection report, and Exhibit 11, which corresponds to a certified copy of Gulf Puerto Rico Lines United States Atlantic and Gulf Puerto Rico Tariff, Federal Maritime Commission Reference No. F–3 of Freight Tariff # 2, original page 33a entitled "Removal of Carriers, Trailer, by Shipper or Consignee for Loading or Unloading", applicable only in Puerto Rico, issued by Mr. D. G. Massingale on May 31, 1967, effective July 5, 1967 and in effect at all material times herein. The Court also received oral testimony of employees of Gulf Puerto Rico Lines and Sea-Land Service, Inc. Defendant did not present any evidence on behalf of its cause and submitted the case with a request for leave to file a memorandum. More than six months have elapsed without the defendant having filed the same.

Taking into consideration the evidence presented by the plaintiff, the Court makes the following

### Findings of Fact

1. On September 16, 1969, John Morell & Co., with address at 17 Battery Place, New York, N.Y. 10004, as shipper, forwarded one trailer, No. 22162, to Associated Food, with address at GPO Box 3812, San Juan, Puerto Rico 00936, said to contain 5,728 pieces of picnics with a gross weight of 40,101 pounds, on board the SS Claiborne, Voyage 103S. Said trailer number 22162 was delivered to the consignee on September 24, 1969, and redelivered to Gulf Puerto Rico Lines at Sea-Land Service, Inc.'s trailer marshaling yard in Puerto Nuevo, Puerto Rico, on October 29, 1969, incurring in demurrage pursuant to the Tariff mentioned, marked Exhibit 11, in the amount of $837.50. See Exhibit 1 for the plaintiff.

2. On October 6, 1969, John Morell & Co., with address at 16 Battery Place, New York, N.Y. 10004, as shipper, forwarded one trailer, No. 24459, to Associated Food, with address at GPO Box 3812, San Juan, Puerto Rico 00936, said to contain 928 cartons of frozen pork and beef with a gross weight of 40,367 pounds, on board the SS Maiden Creek, Voyage 98S. Said trailer No. 24459 was delivered to the consignee on October 9, 1969, and redelivered to Gulf Puerto Rico Lines at Sea-Land Service, Inc.'s trailer marshaling yard at Puerto Nuevo, Puerto Rico, on October 24, 1969, incurring in demurrage pursuant to the Tariff mentioned, marked Exhibit 11, in the amount of $212.50. See Exhibit 2 for the plaintiff.

3. On October 20, 1969, John Morell & Co., with address at 17 Battery Place, New York, N. Y. 10004, as shipper, forwarded one trailer, No. 22726, to Associated Food, with address at GPO Box 3812, San Juan, Puerto Rico 00936, said to contain 4,372 pieces of picnic, with a gross weight of 39,504 pounds, on board the SS Maiden Creek, Voyage 99S. Said trailer No. 22726 was delivered to the consignee on November 3, 1969, and redelivered to Gulf Puerto Rico Lines at Sea-Land Service, Inc.'s trailer marshaling yard at Puerto Nuevo, Puerto Rico, on December 8, 1969, incurring in demurrage pursuant to the Tariff mentioned, marked Exhibit 11, in the amount of $1,037.50. See Exhibit 3 for the plaintiff.

4. On October 27, 1969, John Morell & Co., with address at 17 Battery Place, New York, N.Y. 10004, as shipper, forwarded one trailer, No. 20083, to Associated Food, with address at GPO Box 3812, San Juan, Puerto Rico 00936, said to contain 500 boxes of frozen pork loins, with a gross weight of 40,833 pounds, on board the SS Claiborne, Voyage 106S. Said trailer number 20083 was delivered to the consignee on November 3, 1969, and redelivered at Gulf Puerto Rico Lines' premises in San Juan on November 18, 1969, incurring in demurrage pursuant to the Tariff mentioned, marked Exhibit 11, in the amount of $212.50. See Exhibit 4 for the plaintiff.

5. On October 27, 1969, John Morell & Co., with address at 17 Battery Place, New York, N.Y. 10004, as shipper, forwarded one trailer, No. 29716, to Associated Food, with address at GPO Box 3812, San Juan, Puerto Rico 00936, said to contain 474 boxes of frozen pork loins, with a gross weight of 38,722 pounds, on board the SS Claiborne, Voyage 106S. Said trailer No. 29716 was delivered to the consignee on November 3, 1969, and redelivered to Gulf Puerto Rico Lines at Sea-Land Service, Inc.'s trailer marshaling yard at Puerto Nuevo, Puerto Rico, on November 26, 1969, incurring in demurrage pursuant to the Tariff mentioned, marked Exhibit 11, in the amount of $387.50. See Exhibit 5 for the plaintiff.

6. On October 27, 1969, John Morell & Co., with address at 17 Battery Place, New York, N.Y. 10004, as shipper, forwarded one trailer No. 28137, to Associated Food, with address at GPO Box 3812, San Juan, Puerto Rico 00936, said to contain 6,557 pieces of picnic, with a gross weight of 41,723 pounds, on board the SS Claiborne, Voyage 106S. Said trailer number 28137 was delivered to the consignee on November 25, 1969, and redelivered to Gulf Puerto Rico Lines' facilities in San Juan, Puerto Rico, on December 15, 1969, incurring in demurrage pursuant to the Tariff mentioned, marked Exhibit 11, in the amount of $887.50. See Exhibit 6 for the plaintiff.

7. On September 2, 1969, John Morell & Co., with address at 17 Battery Place, New York, N.Y. 10004, as shipper, forwarded one trailer No. 20048, to Associated Food, with address at GPO Box 3812, San Juan, Puerto Rico 00936, said to contain 6,395 pieces of frozen shoulders, with a gross weight of 38,168 pounds, on board the SS New Yorker, Voyage 124S. Said trailer number 20048 was delivered to the consignee on September 10, 1969, and redelivered to Gulf Puerto Rico Lines directly at its facilities in San Juan, Puerto Rico, on October 24, 1969, incurring in demurrage pursuant to the Tariff mentioned, marked Exhibit 11, in the amount of $1,062.50. See Exhibit 7 for the plaintiff.

8. On September 19, 1969, John Morell & Co., with address at 17 Battery Place, New York, N.Y. 10004, as shipper, forwarded one trailer No. 22105, to Associated Food, with address at GPO Box 3812, San Juan, Puerto Rico 00936, said to contain 5,063 pieces of picnic, with a gross weight of 41,288 pounds, on board the SS New Yorker, Voyage 126S. Said trailer number 22105 was delivered to the consignee on September 30, 1969, and redelivered to Gulf Puerto Rico Lines at Sea-Land Service, Inc.'s trailer marshaling yard at Puerto Nuevo, Puerto Rico, on October 28, 1969, incurring in demurrage pursuant to the Tariff mentioned, marked Exhibit 11, in the amount of $687.50. See Exhibit 8 for the plaintiff.

9. The oral evidence presented by the plaintiff shows that it was the customary practice at all material times for the consignees and/or truckers to redeliver vans and/or trailers that had been pulled out of Gulf Puerto Rico Lines, Inc.'s facilities in San Juan, Puerto Rico, to Sea-Land Service, Inc.'s trailer marshaling yard located in the Puerto Nuevo Area, San Juan, Puerto Rico, since Gulf Puerto Rico Lines, Inc. is a subsidiary of Sea-Land Service, Inc. In order to maintain a record of the trailers pulled out and which arrived at the Sea-Land Service, Inc.'s trailer marshaling yard in Puerto Nuevo, Puerto Rico, an itemized, computerized pulled-and-arrival report was prepared daily showing the trailer number and the date on which the same arrived at said Sea-Land's trailer marshaling yard in Puerto Nuevo, Puerto Rico. See Exhibit 9 for the plaintiff.

10. At all material times the inland transportation of the above mentioned trailers was to be made by the consignee, Associated Food Co., Inc. This is shown by the bills of lading annexed to Exhibits 1 to 8, inclusive, which show that no delivery charges were collected by the plaintiff to the defendant for inland transportation at the port of desti-

nation. Furthermore, Exhibit 10, which is a blank form of the trailer interchange receipt and inspection report, shows that at all material times Associated Food was duly invoiced with copy number 4 of said form, at their known address, for the demurrage owed and outstanding.

### Conclusions of Law

█ Traditionally, demurrage charges for leaving goods on a ship's pier are considered an extension of ocean freight charges, since it would be hard to think of any situation more closely related to water transportation, except for the actual carriage itself, than the incident of demurrage. See Skibsaktieselskapet Siljestad v. United States, 180 F.Supp. 957, 149 Ct.Cl. 141 (1960).

█ In a proceeding before the United States Federal Maritime Commission entitled "Free Time and Demurrage Charges at New York", 3 USMC 89, at page 101, the Commission said:

> "It should be noted that free time is granted by the carriers not as a gratuity, but solely as an incident to their obligation to make delivery. The Eddy, 5 Wall. 481, 495 (18 L.Ed. 486); The Titania (2 Cir.) 131 F. 229, 230. This is an obligation which the carrier is bound to discharge as a part of its transportation service, and consignees must be afforded fair opportunity to accept delivery of cargo without incurring liability for penalties. Free time must be long enough to facilitate this result—but need not be longer. . . . . ."

The Maritime Commission, then, regarded the storage of goods on the pier during the free time as an incident, an implied term, of a ship's contract to transport and deliver goods. It would seem at that time that the owner's corresponding obligation to remove the goods within a reasonable time and not to appropriate the space needed by the ship company for other cargo would be an implied term in the owner's maritime contract. "Free Time and Demurrage Charges at New York", supra, and Skibsaktieselskapet Siljestad v. United States, supra.

█ It is well recognized that demurrage is extended freight, that is, extended ocean freight charges, and that the risk of vicissitudes which prevent the loading or discharge of cargo within the stipulated lay days or free time allowed by tariffs, should be borne by the cargo interest, shipper or consignee, as the case may be. Yone Suzuki v. Central Argentine Ry., 27 F.2d 795 (2nd Cir. 1928); The Marpesia, 292 F. 957 (2nd Cir. 1923). This absolute liability to pay demurrage as an incident to the contract of transportation by water, which is undoubtedly a maritime contract, is subject to three exceptions in the classical doctrine:

(a) Specific clauses in the charter agreements of vessels or in tariffs exonerating the payment of the amount due for demurrage.

(b) The delay being attributed to the fault of the ship owner or those for whom he is responsible.

(c) A vis major amounting to a sudden or unforeseen interruption or prevention of the act itself of loading or discharging not occurring through the connivance or fault of the cargo interest, whether shipper or consignee. See United States v. Atlantic Refining Co., 112 F.Supp. 76, 80 (D.N. J.1971).

Demurrage is not only an incident within the context of the bill of lading contract but also within the context of the afreightment and chartering agreements. In this respect, it has also been traditionally defined as "extended freight". In Pennsylvania Railroad Co. v. Moore-McCormack Lines, 370 F.2d 430 (2nd Cir. 1966) the plaintiff sought to recover demurrage charges for the defendant having delayed the unloading and release of lighters. The Court held that "the general rule is that demurrage is extended freight and, where there has been an excess of lay days over those

stipulated, the consignee is liable to pay demurrage . . ." See also, Hellenic Lines Ltd. v. Director General of India Supply Mission for and on Behalf of Union of India, 319 F.Supp. 821 (S.D.N.Y. 1970), aff'd 452 F.2d 810 (2nd Cir. 1971).

It has been accepted that the concept of demurrage originated in the field of maritime transportation. See 6 A.L.R. 2d 879, where the commentator states:

". . . by way of background it should be stated that demurrage originated in maritime transportation. The carriers by water having no warehouses of their own in which to unload their vessels, upon being deprived of the use of their ships because of some act of the shipper or consignee, were allowed compensation therefor, termed 'demurrage'. It is now quite firmly established that a shipper impliedly contracts with a common carrier to submit to all reasonable rules for regulation of shipments, and that reasonable rules or regulations providing for demurrage are not only proper as between the parties, but are also of the highest public importance, as by their adoption and strict enforcement only can promptness, uniformity, and safety in the railroad traffic business of the country be secured."

In order to be entitled to collect demurrage the carrier's right to demurrage must clearly appear in the tariff regulations and the tariff itself must be made a part of the contract of carriage, although it can be implied. In this respect, at 6 A.L.R.2d 880, the commentator states:

"The exact provisions relating to demurrage generally appear in the tariff regulations which the carrier must publish and to which it must adhere rigidly. This principle of rigid adherence to the provisions of published tariffs is a firmly established principle of the law relating to carriers, and has as its purpose the avoidance of discrimination among shippers. By such means the law attempts to prevent the carrier from charging one party more or less than another for a similar service, or to do indirectly what it may not do directly by waiving any of the provisions of the tariffs in favor of some preferred customer. So zealous is the law in its attempt to insure equal opportunities to all that it will not allow, generally, the working of the common-law principles of estoppel against the carrier. It has become not only the right, but the duty of the carrier to collect demurrage charges."

In Dominica Mining Co. v. Port Everglades Towing Co., 318 F.Supp. 500 (S. D.Fla.1969), aff'd 433 F.2d 986 (5th Cir. 1970), the Court held in essence that where part of the delay in unloading cargo from a barge was attributable to failure of the subcharterer's agents to meet cargo on arrival, the bareboat charterer could recover demurrage for time spent unloading.

In Hellenic Lines Ltd. v. Embassy of Pakistan, 307 F.Supp. 947 (S.D.N.Y. 1969) the Court in essence held that where bills of lading require consignee to discharge continuously 24 hours per day every day, at each port, with no exceptions, consignee was liable under general maritime law of the United States to pay damages for detention for all delays to carrier's vessel caused by its failure regardless of fault to fulfill that obligation.

In Federal Maritime Commission Docket No. 68–9, "Free Time and Demurrage Charges on Export Cargo", 1970 A.M.C. 809, 819, it was stated:

"Insofar as this contention is concerned it is sufficient to note that the free time afforded by the ocean carrier or his agent is a transportation obligation separate and distinct from that of inland carriers and its proper demurrage must be determined by applying the appropriate principles of maritime regulatory law to the circumstances pertaining to the ocean transportation and ocean terminal facilities."

The tariff identified as Exhibit 11 of the plaintiff governing demurrage charges on containers which we already

have stated applies to the present case is a valid tariff filed with and approved by the Federal Maritime Commission which contemplates specific rules for the application of the tariff, for the computing of time, for the computing of free time allowed and for the demurrage charges themselves, which the Court understands is legal.

The transition in the method of cargo carriage from break-bulk to unitization and now to containerization has served to maximize the utilization of space of the vessel while at the same time has minimized the risks to cargo, and unfortunately at the same time the changes in the shipping industry have distorted the common law and statutory framework that defines the traditional duties, liabilities and limitations of the carrier and shipper in relation to the steamship company and the steamship business. Notwithstanding, this Court is of the opinion in light of the traditional doctrine relating to demurrage, that demurrage accrued on trailers even though they have been pulled out of the pier facilities and are probably enjoying free time or are laid accruing demurrage at the consignee's premises, should also be considered extended ocean freight charges and for that reason this Court has jurisdiction to entertain this cause of action as an admiralty and maritime claim pursuant to 28 U.S.C.A. § 1333, all within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, since it would be hard to think nowadays, in light of containerization which is taking over the old break-bulk operations, of any incident more closely related to water transportation than the instant situation, that is, accrual of demurrage on containers, which containers have displaced the traditional demurrage doctrine of pier usage and vessel's hold facilities.

Does the fact that in the instant matter trailer demurrage is involved and not wharf cargo demurrage or vessel's demurrage make any difference in light of the rules above outlined? The Court sees no difference. Under the contract of carriage the cargo interest can either take delivery of the goods at the pier or have it delivered to him by trailer. If in the first of the instances the consignee must pay demurrage for leaving his goods on the pier in excess of the free time because his obligation arises from an incident of the contract of carriage, under the same reasoning, will he not become obligated to pay demurrage for keeping his goods on the trailer beyond the free time provided in the tariff and hence in the contract? There is no reason why the courts should not treat trailer demurrage as it has treated wharf or vessel demurrage. As a matter of fact, in "Free Time and Demurrage Charges on Export Cargo," supra, the Commission said: "This is particularly true in regard to containerized cargo, which may by nature require less free time than other cargo and with respect to which some parties have in fact indicated a desire to establish shorter free time period". Thus, the obligation of the cargo interest to pay trailer demurrage is as much an incident of the contract of carriage as any other type of demurrage.

## JUDGMENT

In view of the aforementioned and taking into consideration the above Findings of Fact and Conclusions of Law, it is hereby adjudged and decreed that the plaintiff have and recover from the defendant the amount of $5,325.00 in addition to the costs of this action. No specific award for attorney's fees is made since this is an admiralty and maritime claim pursuant to 28 U.S.C.A. § 1333, and in light of the decision of the U. S. Court of Appeals for the First Circuit in the case of American Union Transport Co. v. Aguadilla Terminal, Inc., 302 F.2d 394 (1st Cir. 1962), counsel's fees are neither allowable nor taxable as costs in admiralty proceedings.

The Clerk of this Court is hereby ordered to enter judgment accordingly.

It is so ordered.