OCEAN TRANSPORT LINE, INC.,
Plaintiff-Appellee-Cross-Appellant,

v.

AMERICAN PHILIPPINE FIBER
INDUSTRIES, INC., Defendant,

and

Chemtex Fibers, Inc.,
Defendant-Appellant-Cross-Appellee.

Nos. 1335, 1336, Dockets 84–7166,
84–7252.

United States Court of Appeals,
Second Circuit.

Argued June 5, 1984.

Decided Aug. 14, 1984.

Wayne A. Cross, New York City (Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, on brief), for defendant-appellant-cross-appellee.

Alfred F. Koller, Jr., New York City (James M. Textor, Cichanowicz & Callan, Kieron Quinn, New York City, on brief), for plaintiff-appellee-cross-appellant.

Before OAKES and NEWMAN, Circuit Judges, and MISHLER, District Judge.*

JON O. NEWMAN, Circuit Judge.

This is an admiralty action by a carrier to recover discharge port demurrage from a shipper and the shipper's guarantor. Defendant-appellant Chemtex Fibers, Inc. ("Chemtex") appeals from the February 17, 1984, judgment of the District Court for the Southern District of New York (Charles L. Brieant, Jr., Judge), after a bench trial, awarding plaintiff-appellee-cross-appellant Ocean Transport Line, Inc. ("OTL") $475,-224.91. On appeal Chemtex contends primarily that (1) the shipper was obliged to pay only loading port demurrage and (2) Chemtex's guaranty was limited to a specific sum, which it has already paid, and did not cover any demurrage. Chemtex also argues that the damages awarded were too high, and OTL, in its cross-appeal, claims they were too low. For reasons that follow, we affirm the judgment of the District Court in all respects.

### Facts

In 1976, defendant American Philippine Fiber Industries, Inc. ("APFI"), a Philippine corporation, purchased a nylon manufacturing plant in Hopewell, Virginia, with the intent of dismantling, transporting, and reassembling the plant in the Philippines. APFI entered into an agreement with Chemtex, a New York corporation, which agreed to provide "equipment, materials, know-how and technical services in connection with" the project. As the District Court found, "Chemtex was engaging in the function of a project engineer for the entire project including shipment" of the dismantled factory to the Philippines. Chemtex also acted as the financier for the project by loaning APFI $5,100,000 in return for APFI's promissory notes, which were guaranteed by the Development Bank of the Philippines.

In order to transport the dismantled factory, APFI entered into a contract of affreightment with OTL, a Panamanian corporation, which agreed to provide APFI with empty containers and to ship the loaded containers and uncontainerized factory parts to the Philippines. An early draft of the contract of affreightment, dated October 17, 1977, included the following provisions on the subject of container demurrage:

Carrier agrees to supply up to 150–40 foot containers or any additional containers necessary for the carriage of the cargo at Hopewell, VA for discharge Manila, Philippines. Carrier allows shipper 15 days to load containers and 30 days for discharge and return to carrier's designated terminal. Any additional time shipper shall pay demurrage of $4 per day per container. Carrier will supply approximately two containers per day and shipper will load approximately 2 containers per day.

Shipper agrees to take delivery of containers at Manila at end of ships tackle and any expenses for trucking etc. to job site and return to carrier's designated terminal for shippers account.

The contract, as finally executed on October 31, 1977, treated the same subject as follows:

Carrier agrees to supply up to 150–40 foot containers or any additional containers necessary for the carriage of the cargo at Hopewell, VA for discharge Manila, Philippines. Carrier allows shipper 15 days to load containers at Hopewell, VA and 30 days for discharge at Manila and return to carrier's designated terminal at Manila. After 90 days from delivery of first container for loading at Hopewell, VA, if all cargo not delivered that was contracted for, Shipper will pay $4.00 a day demurrage per box for all boxes loaded and to be loaded after 90 days until full cargo delivered.

Shipper agrees to take delivery of containers at Manila at end of ships tackle and any expenses for trucking etc. to job site and return to carrier's designated terminal for shippers account. Containers cost during vessels transit from loading port to Manila for account of carrier.

OTL requested security for APFI's performance under the contract of affreightment. Chemtex executed the following guaranty:

We unconditionally agree to pay ocean freight as per contract dated October 31, 1977 between American Philippine Fiber Industries, Inc. Herman Zucker Textile Corp., Agent and Ocean Transport Line, Inc. Oceanic Operations Corp., Agent. Payment shall be as follows:

1. Downpayment of $87,750 payable immediately with this guarantee.

2. Remaining $497,250 payable upon presentation of on board Ocean Bills of Lading covering shipment of 150–40 foot containers and five copies of invoice stating that the 150–40 foot containers are being shipped at $3,900.00 each less the 15% downpayment.

3. Freight Rate—$3,900.00 per 40 foot container—container weight not to exceed 44,000 lbs. $60 per ton of 2240 lbs. or 40 cu. ft. for any cargo not containerized including extra lengths and heavy lifts. Ocean freight only no trucking cargo to be delivered to carriers designated berth and port. Above 150 containers freight rate of $3,000 per container to apply.

4. Shipper on Ocean Bill of Lading— American Philippine Fiber Industries Inc.

OTL's agent, Oceanic Operations Corporation ("Oceanic"), entered into a trip lease with CTI-Container Leasing Corporation ("CTI"), which supplied the cargo shipping containers. OTL agreed to pay a per-container rental of $435 for the first 90 days plus $4.20 per day thereafter. It also agreed to pay $4,400 for any container lost or destroyed.

The factory was dismantled in the spring of 1978. The ship chartered by OTL was loaded with 168 40-foot containers and nearly 1,000 tons of uncontainerized cargo. After the ship arrived in Manila, all containers were discharged from the ship by July 31, 1978. In October of 1978, twenty-three containers were devanned and returned to the CTI depot in Manila. The remaining containers, however, were not returned until March of 1981.[1]

During the nearly three years' detention of the containers in Manila, OTL sent monthly demurrage invoices to APFI and forwarded copies of the invoices to Chemtex. Oceanic continued to pay CTI at a rate of $4.20 per container per day until it had paid about $390,000. CTI filed a suit against Oceanic and obtained a judgment for $394,163.56 for amounts due on the container lease. *See CTI-Container Leasing Corp. v. Oceanic Operations Corp.,* 682 F.2d 377 (2d Cir.1982) (affirming assertion of admiralty jurisdiction and remanding for a determination of damages).

OTL brought the present suit against APFI and Chemtex in October of 1982 to recover container demurrage for the delay in the return of the containers to the CTI depot in Manila. APFI was served with process in the Philippines but did not appear. Chemtex disputed liability primarily on two grounds. First, it argued that its liability under the guaranty was expressly limited to the sum of $579,000. Second, noting the difference between the "container" provisions in the draft and in the final contract of affreightment, it claimed that the contract as executed excluded any obligation to pay for container demurrage at the discharge port.

At a bench trial each side presented parol evidence to explain the terms of the contract of affreightment and the guaranty. In his ruling from the bench at the conclusion of the trial, Judge Brieant first found that there was "no available parol evidence which satisfactorily explains" the difference between the draft and the final contract of affreightment. The District Judge then construed the contract to include an obligation to pay discharge port demurrage. Judge Brieant also ruled that though the contract did not specify a rate for such demurrage, it should be construed to contain an implied promise to pay such demurrage at a "reasonable" rate.

---

**1.** There is no clear explanation in the record for the protracted delay; the various reasons advanced were the unreadiness of the Manila factory site, APFI's inability to pay the custom duties, and APFI's financial inability to proceed with the project.

Turning to Chemtex's liability under its guaranty, the Court first dismissed the parol evidence as having no relevance to the issues at trial. The Court rejected Chemtex's reading of the guaranty as limited to a specific sum and concluded that since "demurrage is part of freight[,] ... a person liable for freight is also liable for demurrage."

On the issue of damages the Court noted that discharge port demurrage should not exceed the fair market value of the containers. The best evidence of the fair market value, Judge Brieant found, was the $4,400 figure in the CTI-Oceanic trip lease. In addition, the Court found that the $4 per day "loading port demurrage" rate in the contract would not be reasonable for discharge port demurrage over a significant period of time. The Court's judgment therefore applied the $4 rate to discharge port demurrage only during 1978 and applied a $3 rate for demurrage after 1978. Finally, the Court declined to award prejudgment interest against Chemtex for the period before the filing of the complaint because of OTL's delay in filing the suit. Judgment was entered against both APFI and Chemtex in the amount of $475,224.91.

### Discussion

■ Chemtex challenges the District Court's construction of both the contract of affreightment and the guaranty. We consider first Chemtex's claim that an obligation to pay a reasonable rate of discharge port demurrage cannot be implied in a contract of affreightment that specifically provides for loading port demurrage.

The contract as executed permits APFI "15 days to load containers at Hopewell, VA and 30 days for discharge at Manila."[2] Were we construing that provision in isolation, we would readily conclude that APFI had an obligation to pay a reasonable rate of demurrage for detention of the containers beyond 15 days at the Hopewell, Va.,

loading site and beyond 30 days at the Manila discharge site. *See* H. Tiberg, *The Law of Demurrage* 556 (3d ed. 1979) ("Where no demurrage rate has been provided the common law systems grant the shipowner damages for any detention beyond the lay time."); *see also* W. Poor, *Charter Parties and Ocean Bills of Lading* § 49 (5th ed. 1968). The purpose of stipulating days for loading and discharging operations is to allow the shipper a period of time during which it may detain the ship without payment and to make the shipper liable for any detention thereafter. *See New York & Cuba Mail S.S. Co. v. Lamborn*, 8 F.2d 382, 385–86 (S.D.N.Y. 1925); G. Gilmore & C. Black, Jr., *The Law of Admiralty* § 4–8 at 211 (2d ed. 1975). Such well-established admiralty principles extend by analogy to lay-day provisions for cargo shipping containers. *See Gulf Puerto Rico Lines, Inc. v. Associated Food Co., Inc.*, 366 F.Supp. 631, 637 (D.P.R.1973); *see also Northeast Maine Terminal Co. v. Caputo*, 432 U.S. 249, 270, 97 S.Ct. 2348, 2360, 53 L.Ed.2d 320 (1977) ("[T]he container is a modern substitute for the hold of the vessel."); *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 815 (2d Cir.1971) (containers are "functionally a part of the ship").

■ Challenging the clear inference of loading and discharge demurrage obligations that follows from the 15- and 30-lay-day provisions, Chemtex points out that the final contract omits the provision from the draft that had expressly specified a demurrage rate for exceeding the 15- and 30-day periods. Though we agree with Chemtex's premise that the executed contract is sufficiently ambiguous to justify resort to extrinsic evidence, including the draft, we also agree with the District Court that the extrinsic evidence does not satisfactorily explain the significance of the difference between the draft and the final contract. While deletion of the specific demurrage

---

**2.** In this provision, "load containers" means fill the containers with the parts from the dismantled factory, rather than place the containers on board the ship. Hopewell, Va., is the factory site, and the contract designates Norfolk, Va. (or Wilmington, N.C.), as the "loading port." Moreover, the contract expressly provides that the carrier will truck the containers from the plant site to the loading port.

rate provision somewhat suggests an intent to exclude all demurrage, retention of the 30-lay-day discharge provision more strongly suggests an obligation to pay a reasonable rate of discharge port demurrage. A stipulated demurrage rate is merely a liquidated damage provision for breach of a contractual obligation, *Hellenic Lines, Ltd. v. The Embassy of Pakistan,* 467 F.2d 1150, 1157 (2d Cir.1972); *Bailey v. Manufacturers' Lumber Co.,* 224 F. 806, 809 (S.D.N.Y.1915), and in the absence of a stipulated rate, a reasonable rate of demurrage or damages in the nature of demurrage is normally implied. *See Tweedie Trading Co. v. Strong & Trowbridge Co.,* 195 F. 929, 930 (2d Cir.1912) ("There being no sum fixed for demurrage, the respondents must pay damages in the nature of demurrage."); *Leary v. Talbot,* 160 F. 914, 915 (2d Cir.1908) ("The purpose of lay days is to fix the period during which the charterer may detain the vessel in discharging for the agreed freight and beyond which he must pay her an extended freight in the form of demurrage, or of damages in the nature of demurrage.").

Chemtex relies not only on the final contract's omission of the draft's demurrage rate provision but also on the inclusion of the following language:

> After 90 days from delivery of first container for loading at Hopewell, VA, if all cargo not delivered that was contracted for, Shipper will pay $4.00 a day demurrage per box for all boxes loaded and to be loaded after 90 days until full cargo delivered.

In Chemtex's view, this is a loading port demurrage provision, and its inclusion, Chemtex contends, precludes implication of a discharge port demurrage obligation. There are two difficulties with this argument. First, the provision is not, strictly speaking, a *loading port* demurrage provision. It says nothing about the time allowed for loading at either of the two vessel ports specified in the contract. Instead, it provides an aggregate 90-day period to complete the loading of factory parts into the containers at Hopewell.[3] Second, and more significantly, the 90-day provision cannot be read to preclude discharge port demurrage without rendering meaningless the 30-lay-day provision applicable to unloading at Manila.

It is simply not clear precisely what the parties intended. It is possible, as Chemtex argues, that the 90-day provision was intended to be exclusive of a discharge demurrage obligation; in that event, perhaps the parties inadvertently left the 15- and 30-lay-day provisions in the contract. On the other hand, it is more likely that all the provisions were intended to have meaning: The 90-day provision sets an aggregate time period, starting with arrival of the first container, for filing the last container; the 15-day provision sets a limit on the allowable time for filling each container;[4] and the 30-day provision sets a limit for all unloading at Manila. The result is a contract that includes an obligation to pay discharge port demurrage. This view of the contract is not only the more plausible, it is the one evidently shared by the parties during the life of the contract.

In a series of memoranda and correspondence exchanged after the arrival of the vessel in Manila, OTL, Chemtex, and most significantly APFI all acknowledged

---

**3.** Though the 90-day provision refers to payment in the event all "cargo" is not delivered and elsewhere in the contract the containers are referred to as "cargo," it is apparent that the 90-day period refers to filling the containers, not loading them onto the ship. Otherwise, the carrier would be charging the shipper demurrage for the carrier's delay in trucking the filled containers from Hopewell to Norfolk, a transport obligation the contract expressly imposes on the carrier.

**4.** Under the CTI–OTL lease, OTL was obliged to pay a higher per-container rental charge during the first 90 days. Even though the carrier would be liable to CTI at the higher rate for use of the first container for the full 90 days if the shipper filled it within 15 days but used the full 90 days to fill the last container, the carrier stood to benefit from inclusion of the 15-day provision by obliging the shipper to plan a sequence of loading that would most likely enable the carrier to produce containers on a staggered basis, thereby saving rental charges to CTI.

the accrual of discharge port demurrage for failure to discharge and return the containers within 30 days. The parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent. *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118, 33 S.Ct. 967, 972, 57 L.Ed. 1410 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.").

In a September 6, 1978, internal APFI "Progress Report," APFI's Alberto Abanilla states:

Demurrage charges on the containers starting last August 28, 1978 is costing APFI approximately $5,000.00/day and will probably last for at least 2 or 3 months. The decision of management on the choice of a lot should be acted upon at the soonest possible to reduce the demurrage charges APFI has to pay to the shipping Co.

In a September 28, 1978, letter sent from APFI to Chemtex's Manila office, APFI's Assistant Treasurer Carlos Velasco states:

To avoid further demorrage [sic] on the containers, we shall start devanning as soon as possible. However, before we do so, we would like your representative Mr. Lanyon to supervise the devanning if possible.

Additionally, while the doctrine of practical construction is ordinarily limited to the acts and statements of the contracting parties, we deem it of some significance that Chemtex, which was intimately involved as the guarantor of the shipping contract and as the financier and project engineer for the APFI project, also acknowledged the running of discharge port demurrage. In a letter dated July 7, 1978, describing plans for unloading the cargo and transporting it to the Manila factory site, Chemtex's Robert Lanyon notes:

All of this will reduce the demurrage charges of $4 per day per container after thirty days grace period from arrival in Manila.... The 30 days grace period without demurrage charges starts as each container touches the dock.

In a November 17, 1978, Chemtex "Trip Report," which recounts a meeting between APFI and Chemtex representatives in Manila to discuss devanning of containers, Chemtex's Clarence Lawler states:

Mr. Tony Martel [of APFI] stated balance of containers will be unloaded at new plant site, when building completed. He also said it would take 145 days to complete new building, after construction starts. They will continue with demurrage and storage charges on balance of containers.

It is also significant that in 1979 APFI paid $27,300 in discharge port demurrage and that OTL repeatedly sent letters and invoices regarding demurrage to APFI, and APFI never protested.

In light of this extrinsic evidence and the express 30-lay-day provision applicable to discharge at Manila, we agree with the District Court that under well-established admiralty principles APFI was obligated to pay for discharge port demurrage. Absent an express demurrage rate in the contract, OTL is entitled to a reasonable rate of demurrage or damages in the nature of demurrage. *See Tweedie Trading Co. v. Strong & Trowbridge Co., supra*, 195 F. at 930; *Leary v. Talbot, supra*, 160 F. at 915.

We turn next to Chemtex's contention that even if APFI was obliged to pay discharge port demurrage, Chemtex's guaranty was expressly limited to $585,000, a sum which it has already paid.

■ Although the guaranty refers to a down payment of $87,750 and a "[r]emaining $497,250 payable upon presentation of on board Ocean Bills of Lading," the agreement cannot be limited to $585,000 in light of its other provisions and the events surrounding its drafting. The guaranty was drafted five months before the factory was dismantled. At that time the cost of ocean freight was unknown because the number of containers needed and the tonnage of uncontainerized cargo had not been ascertained. The sum specified in the guaranty

obviously refers to the cost of the minimum freight then anticipated—150 containers. Indeed, the guaranty lists the freight rates specified in the contract of affreightment for *more* than 150 containers and for uncontainerized cargo. In addition, other language in the guaranty evinces an intent to cover the entire cost of freight. The first sentence states: "We unconditionally agree to pay ocean freight as per contract dated October 31, 1977." The accompanying cover letter refers to the enclosed document as the "guarantee for the remainder of costs as per the above mentioned contract." We therefore agree with the District Court that the sum specified simply refers to the minimum amount then anticipated and that Chemtex agreed to guaranty the full costs of ocean freight.

■ Chemtex next argues that the guaranty, which must be strictly construed, is expressly limited to ocean freight and cannot be extended to cover demurrage costs. However, despite the rule of strict construction, a guaranty of a contract covers those obligations fairly within the scope of the contract. Under well-established principles of admiralty law, demurrage is "extended freight." *See Yone Suzuki v. Central Argentine R.R.*, 27 F.2d 795, 804 (2d Cir.1928), *cert. denied*, 278 U.S. 652, 49 S.Ct. 178, 73 L.Ed. 563 (1929). Accordingly, one who undertakes to guaranty the costs of ocean freight is secondarily liable for any demurrage incurred.[5]

■ Finally, we consider the parties' claims on the direct and cross-appeals re-

garding damages. In setting a reasonable daily rate for discharge port demurrage the District Court endeavored to restrict the maximum demurrage recoverable on each container to the fair market value of the container at the time and place of redelivery in Manila. Chemtex challenges the District Court's finding "that the best evidence of the value of the containers is to be found in [the CTI trip lease] and represents the negotiated figure of $4,400." That finding is not clearly erroneous. The record evidence on which Chemtex relies for a lower figure is based on the value of the containers at times and places of no relevance to the instant dispute.

Having properly established a ceiling for the discharge port demurrage rate, Judge Brieant then found an appropriate rate within his allowable maximum. We do not agree with OTL on its cross-appeal that Judge Brieant should have applied the $4.20 daily container rate in the OTL–CTI trip lease. The 90-day provision of OTL's contract with APFI sets a $4 daily rate for loading demurrage. The District Court was entitled to find that a reasonable rate for discharge port demurrage was $4 a day during 1978 and $3 a day thereafter.[6] The District Court justifiably held that, over an extended period of time, $4 a day would be excessive.

■ Nor was it an abuse of discretion either to award prejudgment interest, *see Mitsui & Co., Ltd. v. American Export Lines, Inc.*, 636 F.2d 807, 823 (2d Cir.1981), or to limit such interest to the period after

---

5. Since we hold that Chemtex is liable for demurrage under the guaranty, we find it unnecessary to review the District Court's alternative "constructive trust" theory, which was based primarily on Chemtex's confirmation of a false disbursement schedule sent by APFI to the Development Bank of the Philippines.

6. There is a discrepancy between Judge Brieant's oral decision and the judgment concerning the calculation of demurrage charges. Judge Brieant stated that the $4 rate would apply to containers returned before the end of 1978 and the $3 rate would apply *to containers returned thereafter*. The judgment applies the $4 rate to all containers during 1978 and applies the $3 rate only to detention of containers *dur-*

*ing the period after 1978.* Chemtex contends that, as to containers returned after 1978, the judgment should apply the $3 rate during the entire period of their detention. Judge Brieant, as the fact-finder, was entitled to award damages on either formulation. Since the dispute concerning application of the $3 rate was contested before Judge Brieant after he made his oral decision, it seems likely that the judgment reflects his considered resolution of the dispute. In any event, we will affirm the calculation as reflected in the judgment, without prejudice to an application by Chemtex to Judge Brieant to correct the judgment under Fed.R.Civ.P. 60, if in fact it does not carry out his intention.

the filing of the lawsuit in light of OTL's latches in commencing the action against Chemtex.[7]

The judgment of the District Court is affirmed.

7. There is also a discrepancy between Judge Brieant's oral decision and the judgment concerning the calculation of prejudgment interest. Judge Brieant stated that prejudgment interest should accrue against APFI from the "due dates" and against Chemtex only from the date of the complaint. When a form of judgment against Chemtex was tendered, specifying prejudgment interest from the date of the complaint, Judge Brieant inserted APFI as an additional defendant, thereby subjecting it to the same limited prejudgment interest. OTL contends on its cross-appeal that it is entitled to additional prejudgment interest against APFI. Judge Brieant, as fact-finder, was entitled to award prejudgment interest against APFI from either date. As with the demurrage rate, *see* note 6, *supra,* we will affirm the calculation in the judgment, without prejudice to an application by OTL to Judge Brieant to correct the judgment under Fed.R.Civ.P. 60, if in fact it does not carry out his intention.