**BOARD OF EDUCATION, YONKERS CITY SCHOOL DISTRICT, Plaintiff,**

v.

**CNA INSURANCE COMPANY and Continental Casualty Company, Defendants.**

**No. 85 Civ. 8859–CLB.**

United States District Court, S.D. New York.

Nov. 19, 1986.

P. Daniel Hollis, III, Anderson, Banks, Moore, Curran & Hollis, Mount Kisco, N.Y., for plaintiff.

John F. Morrison, Rivkin, Radler, Dunne & Bayh, Garden City, N.Y., for defendants.

## MEMORANDUM AND ORDER

BRIEANT, Chief Judge.

The parties have each moved for summary judgment in this diversity action involving the construction of an insurance contract. Plaintiff Board of Education, Yonkers City School District (hereafter "the Board"), is one of the defendants in a school and housing segregation suit instituted by the United States Department of Justice in December 1980. (*United States of America v. Yonkers Board of Education, City of Yonkers, and Yonkers Community Development Agency*, 80 Civ. 6761 (LBS), hereafter "the underlying lawsuit"). Defendant Continental Casualty Company (hereafter "Continental"), a member of the CNA Insurance Group, is the Board's liability insurance carrier. Disputed in this action is whether Continental must indemnify the Board for the cost of defending the segregation suit.

## THE UNDERLYING LAWSUIT

On December 1, 1980, subsequent to a long investigation, the Department of Justice commenced an action against the City of Yonkers, the Yonkers Community Development Agency and the Yonkers Board of Education for intentionally creating and maintaining racial segregation in the City's housing and schools.[1] The complaint also alleged area-wide discrimination by race and breach of contractual assurances made by the Board in return for its continuing receipt of federal assistance.

On November 20, 1985, after a trial that lasted almost 100 days, Judge Sand of this Court found that both the City and the Board had engaged in intentionally segregative practices. *United States of America v. Yonkers Board of Education*, 624 F.Supp. 1276 (S.D.N.Y.1985). In a 589 page decision, Judge Sand found that the Board had rendered "individual, deliberately segregative school opening, closing, and attendance zone decisions," 624 F.Supp. at 1526; had exhibited "segregative intent with current segregative impact ... in the assignment of faculty and administrative staff," 624 F.Supp. at 1527; had steered minority students into vocational educational programs "followed by the continued adherence to the knowingly segregative policies ... operat[ing] to deprive minorities (particularly blacks) of equal educational opportunities on the secondary school level," 624 F.Supp. at 1528; had reinforced discriminatory community attitudes toward minorities in the operation of the Special Education program, 624 F.Supp. at 1528; and had rejected or failed to implement school desegregation plans. 624 F.Supp. at 1529.

Judge Sand found that "[t]he Yonkers public schools not only are racially segregated but also are unequal in the quality of educational opportunity afforded to students in these schools." 624 F.Supp. at

---

1. The complaint in the underlying lawsuit alleged that:
 "Specific racially discriminatory practices of the School Board which have resulted in the unlawful segregation of students by race include, but are not limited to, the following:
 (a) A pattern of school construction that has intentionally perpetuated and aggravated racial separation in the school system;
 (b) A pattern of school closings that has also intentionally perpetuated and aggravated racial separation in the system;
 (c) The alteration of attendance zone lines for racial reasons;
 (d) The assignment of faculty and administrators by race according to the racial composition of students at individual schools;
 (e) The discriminatory assignment and intact busing of minority students to special education classes;

(f) The historical steering of minority students, first into an inadequate vocational program and later ... into the 'general' program ... which offered a severely restricted curriculum;
(g) The denial of equal educational opportunity to minority students ...;
(h) The School Board's failure to adopt—for racial reasons, in disregard of state policy, and with the support of city officials—[a desegregation plan]...." Complaint in the underlying lawsuit, ¶ 17.
The complaint also alleged that the City of Yonkers selected sites for public and subsidized housing "which intentionally and effectively perpetuated and seriously aggravated racial segregation...." Complaint in the underlying lawsuit, ¶ 19.

1530. He noted that while school authorities acknowledged the disparities in educational opportunity, they repeatedly refused to implement comprehensive desegregative measures, a decision that was "racially influenced." 624 F.Supp. at 1531. Judge Sand found the Board and the City liable for the existence of an unconstitutionally segregated school system. He found the City additionally liable for systematically segregated public housing which aggravated the school segregation.

In the months following the finding of liability, Judge Sand conducted hearings on the action's remedy phase and supervised negotiations among the parties. On May 13, 1986, Judge Sand entered a final order for desegregation of the Yonkers public school system, 635 F.Supp. 1538 (S.D.N.Y. 1986); and on May 28, 1986, he entered a final housing remedy order. 635 F.Supp. 1577 (S.D.N.Y.1986). In both instances, the court retained jurisdiction to enforce the terms of the orders. Notices of appeal from the remedy orders have been filed and are pending in the Court of Appeals. In addition, local homeowners have filed a notice of appeal from denial of participation as proposed intervenors concerning a housing order issued on June 26, 1986.

Throughout the underlying lawsuit, the Board has maintained contact with its liability insurer Continental and in July 1985, formally demanded reimbursement for nearly three million dollars in legal fees and expenses.[2] Continental ultimately refused to pay and as a result the Board instituted this suit.

## THE COVERAGE DISPUTE

The instant action arises out of two insurance policies, issued to the Board by Continental, in effect during the pendency of the Department of Justice lawsuit described above. Complaint ¶¶ 6–9. The policies are designated "Board of Education Liability Including School District Reimbursement" or "BEL" policies. The Board alleges in its complaint that the policies provide coverage for the cost of defending against charges of race discrimination. The Board primarily relies on "clear and unambiguous" language in the policies and on a "coverage letter" Continental sent in response to notice from the Board of the commencement of the underlying lawsuit, indicating that it would indemnify defense costs.

Continental contends that the policies expressly exclude coverage of any loss arising out of charges of intentional segregation, and that its letter does not work an estoppel and is not evidence of coverage, but rather constitutes a "reservation of rights."

Continental has been writing liability insurance for the Board since 1975. It does not insure the City of Yonkers or any other defendant in the underlying lawsuit. The first policy in dispute here went into effect in May 1978 for a period extending to May 1981 (BEL 116 60 511). The second, "successor" policy covered the period from May 1981 to May 1984 (BEL 006 88 36 05). It contains all the language and provisions considered relevant by the parties in the first policy. The stated limit of liability on the successor policy is $5,000,000.00, as opposed to $3,000,000.00 on the first policy.[3]

---

**2.** The Board has not requested reimbursement for, and the parties agree that the Board is not entitled to coverage for, the cost of implementing the desegregation plan, a liability estimated at 37 million dollars.

**3.** Continental claims that only one policy, covering the period 1978–1981, was placed in dispute by the complaint in this action and that the Board improperly introduced the successor 1981–1984 policy into this action for the first time in its motion for summary judgment. The complaint in this action, however, fairly can be read to rely on both policies in asserting a claim

for breach of contract and declaratory relief. Although paragraph nine of the complaint refers to the "policy" in the singular, it defines such policy as including both the first and the successor policy:

"9. The policy extended for a period of three (3) years up to and including May 1, 1981, and was renewed for an additional three (3) years."

Furthermore, the complaint identifies both policies by the number of the successor policy, undercutting any claim by Continental that the complaint did not give adequate notice that the

Subsequent to the filing of the complaint in the underlying lawsuit on December 1, 1980, the Board and Continental were parties to numerous communications, the existence and contents of which cannot be disputed, regarding insurance coverage. By letter dated December 4, 1980, the Board sent the complaint in the underlying lawsuit to its insurance broker, Marsh and MacLennan. Marsh and MacLennan in turn forwarded the complaint to Continental on December 10, 1980, requesting Continental's "position as it pertains to the defense of this matter." By letter dated December 23, 1980, the Manager of Professional Liability Claims for Continental acknowledged receipt of the notice, and indicated that the matter was being referred to the claims office and that the responsibility for the assignment of an attorney rested with the Board. Apparently finding no satisfactory counsel in this district, the Board thereafter retained the Detroit law firm of Butzel, Long, Gust, Klein & Van Zile.

By letter dated January 7, 1981, a Continental claims supervisor advised the Board's broker, Marsh and MacLennan, that

"We are presently examining the allegations of the complaint with our home office and will advise you more fully concerning our position on coverage in the very near future."

The claims supervisor then sent a memorandum to a Continental "Home Office Analyst" on January 16, 1981, requesting advice as to "any particular language to recite on this type of case" and noting that "[i]t will be an expensive case to defend obviously." On January 20, 1981, the Home Office Analyst responded by directing the claims supervisor to

"Include on reservation

1. Our coverage is only for named 'Board of Ed' not co-defts [sic].

2. Policy will not respond for costs of implementing desegregation plan.

3. New York State Provision—Exclu [sic] IV(b)(5) 'for injury arising out of discrimination.'

Board was invoking the successor policy as well

4. That *policy will respond for defense costs.*" [Emphasis added].

On April 10, 1981, the Continental claims supervisor sent the Board what it terms a "coverage letter" and what Continental terms a "reservation of rights." As directed by the Home Office Analyst, the letter recites the names of those entities to which coverage is provided and states:

"The cost of investigating and defending legal actions are payable as part of loss under this policy. The company does provide the defense, and the assureds must retain their own attorney for the defense of the case."

The letter then requests from counsel retained by the Board information on defense plans and fee arrangements. It continues:

"Although our policy will respond for defense and investigative costs in connection with this litigation, it is subject to a retention of $2500, and further policy will not respond for any expenses or costs which may become the responsibility of the Yonkers Board of Education for implementing a desegregation plan."

The letter concludes by advising the Board to review the policy's "clarification endorsement" and "New York State Provision."

Subsequent to this exchange, the Board periodically communicated with Continental as to the progress of the underlying lawsuit and the extent of defense costs. Continental's "file activity sheet," a diary of actions taken with respect to the Board's claim, reflects numerous meetings and telephone conversations with the Board, the Board's insurance broker, and the Butzel law firm. During the pendency of the underlying lawsuit, Continental received written and oral status reports and at least two fee summaries. Continental established a $20,000 reserve fund to cover defense costs, which reserve was raised to $250,000 in January 1983, then recommended to be raised to $2,000,000 in May 1983 and $3,000,000 in October 1983. One unsuccessful attempt at obtaining reimburse-

as the first policy as a basis for its claims.

ment from Continental was made in early 1984 by Marsh and MacLennan, according to its "underwriting file." Continental has not made any payment to the Board.

By letter dated July 29, 1985, the Board's then Superintendent of Schools, Joan Raymond, formally demanded reimbursement of defense costs with interest. Continental responded by requesting an audit of all bills and expenses paid by the Board. Subsequent to the audit, by letter dated October 15, 1985, Continental disclaimed liability for "any coverage and/or payment under the policy." On October 28, 1985, the Board served on Continental a verified complaint alleging breach of contract for payment of legal fees totalling 3.2 million dollars, on its face a somewhat surprising amount considering that legal services rendered by the Butzel law firm extended to all defendants in the underlying lawsuit, but only the Board is insured by Continental. The Board also requests declaratory relief as to the respective rights and obligations of the parties under the insurance contract, and requests five million dollars in punitive damages for Continental's alleged willful and vexatious failure to pay the claim.

### THE INSURANCE POLICIES

In the "insuring clause" of the disputed policy, Continental agrees to pay in accordance with the terms of the policy all "loss" for a "Wrongful Act" for which the School District may be required or permitted to indemnify its "Assureds," or all loss which the School District became legally obligated to pay. The policy is subject to the following definitions:

"(c) Wrongful Act shall mean any actual or alleged errors or misstatement or misleading statement or act or omission or neglect or breach of duty by the Assureds in the discharge of their duties, individually or collectively, or any matter claimed against them solely by reason of their being or having been Assureds during this policy period.

"(d) Loss shall mean any amount which the Assured or School District are legally obligated to pay, including, but not limited to, any amounts which the School District may be required or permitted to pay as indemnity to an Assured, for a claim or claims made against an Assured for a Wrongful Act and shall include but not be limited to damages, judgments, settlements and costs, *cost of investigation and defense of legal actions* (excluding from such costs of investigation and defenses, salaries of officers or employees of the School District or any other governmental body) *claims or proceedings and appeals therefrom,* costs of attachment or similar bonds, provided always, however, such subject of loss shall not include fines imposed by the law, or matters which shall be deemed uninsurable under the law pursuant to which this policy shall be construed." [Emphasis added].

As a preliminary matter, the Court notes that the subject policy is a "claims made" policy which applies the liability limit in effect at the point in time the claim against the insured was first made. The policy provides a type of liability insurance that obligates the insured to engage and control its own defense. "Loss," whether incurred by way of judgment, settlement or defense costs, is charged against the policy limit without distinguishing between damages and legal fees. Continental has the option, but not the obligation to advance expenses. The insured must obtain Continental's consent, which is not unreasonably to be withheld, before expenses are incurred or settlements made. If Continental advances expenses and "it is finally established the Insurer has no liability" under the policy, then the insured agrees to reimburse those payments.

The policy also states, in pertinent part:
"CLARIFICATION ENDORSEMENT
Nothing in this policy shall be construed to insure loss arising out of or in any way attributable to:
1) any failure to integrate or desegregate the student enrollment or participation in any school district, school or educational or extra-curricular program

on the basis of race, ethnic background or national origin, or,

2) the bussing or other transportation of students to or from schools or extra-curricular events in connection with a program or plan of such integration or desegregation, or,

3) causing or allowing the student enrollment or participation in any school district, school or education or extra-curricular program to be operated or administered on a discriminatory basis because of race, ethnic background or national origin.

\* \* \* \* \* \*

"LIBERALIZATION CLAUSE

If, prior to the effective date stated in this certificate or during the term of this certificate, the Insurer has adopted, or adopts, revised provisions for the form of the policy renewed by this certificate in order to afford, without additional premium, broader insurance to the types of insureds covered by this policy, the insurance afforded for the policy period stated in this certificate shall be construed in accordance with the provisions of such revision."

Inserted as an "exclusion" to the policy, the New York State Provision reads:

"(7) [the Insurer is not liable] for injury arising out of discrimination because of race, religion, nationality, national origin, creed, color, sex or age; but *this exclusion shall not apply to the fees, costs and expense attributable to the investigation, defense and appeal of any claim alleging such discrimination if such fees, costs and expenses are included in the definition of loss contained in this contract.*" [Emphasis added].

One other policy provision is relevant here, that excluding coverage

"(6) For any amounts due, under the terms of any contractual obligation; however, except with respect to construction or demolition contracts *this exclusion shall not apply to fees, costs and expenses of the investigation, defense or appeal of any claim or suit or arbitra-*

*tion or administrative proceedings resulting from failure to perform or breach of any contract.*" [Emphasis added].

THE MOTIONS FOR SUMMARY JUDGMENT

Continental relies on three grounds for its motion for summary judgment dismissing all claims against it: that the applicable policy states unambiguously that it does not insure the loss incurred by the Board in defending the underlying lawsuit; that coverage cannot be created here by application of the doctrines of estoppel or waiver; and that the Board's allegations of wrongdoing by Continental do not support a claim for punitive damages.

The Board also has moved for summary judgment requesting (1) a declaration that Continental is liable for defense costs under the 1978–1981 policy; (2) a declaration that Continental is liable for defense costs under the 1981–1984 policy; (3) punitive damages as calculated by their deterrence value; (4) trial on the issue of compensatory damages; and (5) in the alternative, trial on the issues of both liability and damages, and leave to amend the complaint to allege fraud. The Board contends in support of its motion for summary judgment that the language of both policies covers the cost of defending the race discrimination claims asserted in the underlying lawsuit, that the policies also cover the cost of defending the claim of breach of contractual assurances, that Continental is estopped from denying coverage, and that Continental had and has a contemporaneous duty to pay defense costs to the Board during the pendency of the underlying lawsuit.

CONSTRUCTION OF THE CONTRACT OF INSURANCE

Resolution of the motions addressed herein requires no more than a judicial construction of the meaning of various policy provisions. These policies were issued and accepted in New York and the insured is a New York governmental entity. That New York law should be applied seems

obvious and is apparently not disputed. It is established in New York that "[r]ules for construction of contracts of insurance do not differ from those applied to the construction of other contracts," *McGrail v. Equitable Life Assur. Soc.*, 292 N.Y. 419, 424, 181 N.Y.S.2d 489, 155 N.E.2d 390 (1944), including the well-accepted rule that any ambiguity must be resolved against the drafter. *Greaves v. Public Serv. Mut. Ins. Co.*, 5 N.Y.2d 120 (1959). Thus, New York decisions comport with the "hornbook rule that policies of insurance ... are to be liberally construed in favor of the insured," *Miller v. Continental Ins. Co.*, 40 N.Y.2d 675, 678, 389 N.Y.S.2d 565, 358 N.E.2d 258 (Ct.App.1976), and recognize that "[a] construction favorable to the insurer will only be sustained where it is the sole construction which can fairly be placed upon the words employed." *Cantanucci v. Reliance Ins. Co.*, 43 A.D.2d 622, 349 N.Y.S.2d 187, 191 (3rd Dep't), *aff'd mem.* 35 N.Y.2d 890, 364 N.Y.S.2d 890, 324 N.E.2d 360 (Ct.App.1974).

As with most contracts, where an insurance policy's terms are clear and unambiguous, they must be so read. The Court may not "disregard clear provisions which the insurers inserted in the policies and the insured accepted, and equitable considerations will not allow an extension of coverage beyond its fair intent and meaning." *Caporino v. Travelers Ins. Co.*, 62 N.Y.2d 234, 239, 476 N.Y.S.2d 519, 465 N.E.2d 26 (1984) (per curiam; citation omitted). The construction and effect of unambiguous provisions in an insurance policy is solely a question of law for the court. *Caporino, supra,* 62 N.Y.2d at 239, 476 N.Y.S.2d 519, 465 N.E.2d 26. The Court also is entrusted with the construction of ambiguous provisions unless "determination of the intent of the parties depends on the credibility of extrinsic evidence, or on a choice among reasonable inferences to be drawn from extrinsic evidence." *Hartford Acc. & Ind. Co. v. Wesolowski*, 33 N.Y.2d 169, 172, 350 N.Y.S.2d 895, 305 N.E.2d 907 (1974); *Stainless, Inc. v. Employers' Fire Ins. Co.*, 69 A.D.2d 27, 418 N.Y.S.2d 76, 79 (1st Dept.), *aff'd mem.*, 49 N.Y.2d 924, 428 N.Y.S.2d 675, 49 N.Y.2d 924 (1979). Where resolving ambiguities in an insurance contract presents disputed issues of material fact, the issue of construction must await the findings of the trier of fact.

This case does not present the Court with an insurance policy containing provisions which conflict on their face. Read as a whole, as it must be, the policy excludes indemnity for losses arising out of race discrimination or segregation, and clearly includes indemnity for the cost of investigating and defending claims based on the excluded peril. Fairly read, these provisions are not necessarily repugnant and do not present genuine issues of material fact. Whether coverage exists here can be determined as a matter of law.

It is well-settled that "the construction of certain provisions in an insurance policy which does not require an inquiry into the parties' intentions or the consideration of outside and conflicting evidence properly may be resolved by summary judgment." Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2730.1, at 296. Summary judgment is appropriate where the moving party has satisfied its burden and the record reflects "that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." F.R.Civ.P. 56(c). In evaluating the instant motion for summary judgment, the Court is mindful of recent Circuit Court and Supreme Court decisions further clarifying the legal standards applicable under Rule 56.

The Circuit Court in *Quarles v. General Motors Corp.*, 758 F.2d 839 (2d Cir.1985), affirmed a grant of summary judgment in a franchise termination case, although the record identified many unsettled factual issues, holding that

"the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment."

758 F.2d at 840. In *Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.,* — U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court reversed a denial of summary judgment in an antitrust case emphasizing that to preclude summary judgment,

> "the issue of fact must be 'genuine.' . . . When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to material facts."

106 S.Ct. at 1356. It appears that controlling precedent has reinvigorated the "materiality" and "genuineness" requirements for identifying factual issues necessitating a trial under Rule 56, thus making it more difficult to avoid summary judgment by disputing insignificant underlying facts. *E.g., Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9 (2d Cir.1986).

Added encouragement to Rule 56 motions also is evident in the recent Supreme Court decision in *Anderson v. Liberty Lobby, Inc.,* — U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Observing that "the mere existence of a scintilla of evidence" is insufficient to oppose summary judgment, the Court required "evidence on which the jury could reasonably find for the [opposing party]." 106 S.Ct. at 2512. The Court elaborated that "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." 106 S.Ct. at 2513. In the case at bar, Continental ultimately must show that the construction of the insurance contract favorable to it is the sole construction which fairly can be placed upon the disputed provisions. *See Seaboard Surety Co. v. The Gillette Co.,* 64 N.Y.S.2d 304, 311, 486 N.Y. S.2d 873, 476 N.E.2d 272 (1984); *Cantanucci, supra,* 43 A.D.2d 622, 349 N.Y.S.2d at 191.

The Court finds that Continental will be unable to make that showing. Continental contends that the underlying lawsuit here has turned out not to be covered by the subject policy and therefore Continental has no liability for its defense. Continental argues that, although the underlying lawsuit was brought to enforce the Civil Rights laws, the Fourteenth Amendment of the Constitution, and contractual assurances, the entire suit proceeded on the theory of unlawful racial segregation as reflected in all of Judge Sand's published opinions.[4] Because the clarification endorsement clearly prohibits coverage for "loss arising out of . . . any failure to integrate or desegregate" regardless of the theory of liability, and because the policy elsewhere defines loss to include defense costs, Continental contends that the Board is not entitled to any reimbursement for the cost of defending the segregation suit. Read as a whole, the policy does not support this construction.

 The meaning of language used in an insurance policy must be found in common speech of the average person, and in the reasonable expectation and purpose of the ordinary businessman engaged in the insured's line of business. *Ace Wire & Cable Co., Inc. v. Aetna Cas. & Sur. Co.,* 60 N.Y.2d 390, 398, 469 N.Y.S.2d 655, 457 N.E.2d 761 (1983). Especially when an insurer seeks to exclude certain coverage from its policy obligations, it must do so in "clear and unmistakable" language. Exclusions or exceptions from coverage "are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction." *Seaboard Surety Co. v. The Gillette Co., supra,* 64 N.Y.2d at 311, 486 N.Y.S.2d 873, 476 N.E.2d 272.

 Applying this standard to the entire policy including the New York State Provision, it follows that the provision's plain meaning necessarily excludes coverage for

---

4. Judge Sand made no finding on the issue of contractual breach. The contractual claim was mere window dressing in the underlying lawsuit because the Board contracted only to do that which the law requires, namely to refrain from discrimination based on race, color or national origin in the application of federal assistance. 34 C.F.R. § 100.1, *et seq.* (1985). The underlying lawsuit cannot be regarded fairly as a breach of contract claim.

settlements and judgments in discrimination suits but exempts from the exclusion the coverage which would otherwise exist for defense costs. The provision states that the exclusion for "injury arising out of discrimination ... shall not apply to the fees, costs and expenses attributable to the investigation, defense and appeal of any claim alleging such discrimination if such fees, costs and expense are included in the definition of loss contained in this contract." In an earlier provision of the policy, "loss" is defined to include all defense costs. Taken together, the two policy provisions furnish coverage for defense costs, and reading the policy as a whole, the average person is not likely to reach Continental's conclusion that coverage for defense costs is unavailable unless specifically allowed in yet a third policy provision.

■■■ The specificity with which the New York State Provision addresses and exempts from exclusion coverage for defense costs in discrimination suits also compels the Court to find such coverage in the case at bar, notwithstanding the strained reading of the clarification endorsement now urged by Continental. Even in a case of repugnancy between general and special provisions of a contract, not clearly present here, the special provisions will control the general ones. *John Hancock Mut. Life Ins. Co. v. Carolina Power & Light,* 717 F.2d 664, 669 n. 8 (2d Cir.1983); *Waldman v. New Phone Dimensions, Inc.,* 109 A.D.2d 702, 487 N.Y.S.2d 29, 31 (1st Dep't 1985). Where an insurance contract contains conflicting clauses, that which affords greater or more inclusive coverage will govern. 29 *N.Y.Jur.,* Insurance § 613, at 602 (1963).

The clarification endorsement is silent as to defense costs; it merely states in broad terms that the policy will not cover loss arising out of claims of segregative or dis-criminatory practices. Its purpose is to make more clear that as a matter of public policy, the cost of remedying such practices or paying money damages for such violations is not a proper subject of indemnification.[5] It does not reduce the clarification endorsement to a "mere redundancy," as Continental claims, to refuse to read it as nullifying the New York State Provision's specific instructions regarding defense costs. Rather, the provisions can be reconciled and both given effect by reading them to allow coverage for defense costs to the extent attributable to claims of discrimination and to exclude coverage for all other loss (including the damages and expense of the remedy) arising out of the underlying lawsuit. *See American Home Products Corp. v. Liberty Mut. Ins. Co.,* 565 F.Supp. 1485, 1492 (S.D.N.Y.1983) (Sofaer, J.) ("To disregard express language in an insurance contract because of a claimed ambiguity would violate the more fundamental rule of construction that requires a court to construe the contract as a whole and, whenever possible, give effect to all of its parts." [Citation omitted, *aff'd as modified,* 748 F.2d 760 (2d Cir.1984)]).

The Court is mindful that "[w]hen a contract is so ambiguous as to require resort to other evidence to ascertain its meaning and that evidence is in conflict, the grant of summary judgment is improper." *Heyman v. Commerce and Industry Insurance Co.,* 524 F.2d 1317, 1319 (2d Cir.1975) (citation omitted). The rationale for this proposition is that resolving ambiguities in a contract by means of extrinsic evidence of the parties' intent, raises a question of fact precluding summary judgment. "The usual statement of the rule, however, assumes that there is at least some evidentiary support for competing interpretations of the contract's language." *National Union Fire Ins. Co. v. Argonaut Ins. Co.,* 701

---

5. Significantly, the New York State Department of Insurance, which must approve all policy language, has indicated that coverage for defense costs in discrimination actions actually advances the public interest. The Board has submitted Continental's copy of a 1975 letter from the New York State Department of Insur- ance stating that it is desirable "to encourage service on hospital boards, school boards, etc. by negating the inhibition against serving which an otherwise responsible person might feel were he faced with the possibility of having to defend groundless claims at his own expense."

F.2d 95, 97 (9th Cir.1983); *see also Sterling National Bank and Trust Co. v. Fidelity Mortgage Investors,* 510 F.2d 870, 875 (2d Cir.1975) (summary judgment appropriate in action on promissory note where "only one inference—the utter absence of any sign of fraudulent intent—can reasonably be drawn from the facts").

This case presents no such evidentiary support. Invoking the phrase "underwriting intent," Continental's Manager of Professional Liability Claims, Michael D. Karson, attempted in deposition testimony to draw a distinction between the clarification endorsement and the New York State Provision that would preclude coverage here. Even though both provisions use the blanket term "discrimination," he now claims that the clarification endorsement speaks to claims of area-wide discrimination of the sort alleged in segregation suits, while the New York State Provision speaks to claims of individual acts of discrimination of the sort alleged in employment suits. Thus, according to Continental, coverage for defense costs under the New York State Provision would be limited to claims of individual acts of discrimination not alleged in the underlying lawsuit.

At his deposition, Mr. Karson, an experienced Continental executive, was requested to elaborate on this asserted distinction between the clarification endorsement and the New York State Provision:

"Q. Could you show me where in the New York State Provision it says individual acts? Take a look.

A. The word 'individual acts' is not specifically stated. However, it is our underwriting intent and coverage interpretation that [the New York State Provision] is intended to in fact remove coverage for individual acts of discrimination. * * *

Q. Is that intention written down anywhere within the—

A. I really do not know.

Q. How do you know of that intention?

A. That is my interpretation having the ultimate responsibility for coverage. Likewise, knowing what I know currently subsequent to the declaratory action in the Yonkers case. The Yonkers case did not involve discrimination because of race, religion, nationality, et cetera. It was a segregation issue, which comes squarely under the clarification endorsement."

Q. Segregation and race [discrimination] are not similar terms?

A. Well, they—We're splitting hairs here on that issue....

As made clear by this testimony, Continental's contrived distinction cannot be discerned from the face of the policy. Undisclosed opinions of "underwriting intent" acquired after the fact have little weight in construing an insurance policy and will not be considered to raise a genuine issue of material fact. This is the case especially where, as here, such opinions contradict the interpretation compelled by the applicable canons for the construction of contracts.

The parties' interpretation of the subject policy in practice, prior to the Board's instituting this lawsuit, further illustrates that there is no evidentiary support for the interpretation of the policy now proffered by Continental on this motion. It is well-settled that the parties' practical interpretation of a contract, prior to litigation, is deemed of great, if not controlling, influence. *Ocean Transport Line, Inc. v. American Philippine Fiber Industries, Inc.,* 743 F.2d 85, 91 (2d Cir.1984); *Kama Rippa Music, Inc. v. Schekeryk,* 510 F.2d 837, 842 (2d Cir.1975); *Websters Red Seal Publication, Inc. v. Gilberton World-Wide Publications, Inc.,* 67 A.D.2d 339, 415 N.Y. S.2d 229, 230 (1st Dep't), *aff'd mem.,* 53 N.Y.2d 643, 438 N.Y.S.2d 998, 421 N.E.2d 118 (1979).

Immediately following the filing of the underlying Department of Justice lawsuit in December 1980, as any prudent defendant in a lawsuit would do, the Board inquired of its broker concerning its liability insurance coverage. That inquiry set off a flurry of internal communications at Continental, which resulted in the letter dated

April 10, 1981, sent to the Board, describing the coverage available. The letter stated unambiguously that the BEL policy "will respond for defense and investigative costs in connection with this litigation."

Over the next five years, Continental gave every appearance of acknowledging its obligation to indemnify the Board for the cost of defending the underlying lawsuit. Continental monitored closely the progress of the underlying lawsuit, communicating and meeting with the Board and the Butzel firm at frequent intervals, and requesting status reports and billing statements. Continental notified its reinsurer of its exposure to defense costs, established a reserve fund to cover those costs, and periodically revised or considered revising its "case estimate" or reserve.

Again, in May 1983, Continental affirmed by letter to the Board that it would provide coverage of defense costs, but warned that in light of mounting legal bills, the excess carrier, if any, should be put on notice:

"There is coverage of three million dollars which is quickly being used up by way of legal fees. I suggest that you immediately put the excess carrier, if there is one, on notice to protect your interests."

Later that year, Continental determined not to renew the successor policy because of the "large claim" pending against the Board, a fact that surely would be irrelevant to renewal if such claim were not entitled to coverage.

Continental now designates its representations regarding coverage as "reservations of right" and attributes to "prudence" the triggering of the insurance company's internal mechanisms for processing the Board's claim. Arguing that the policy "clearly and unambiguously" excludes coverage, Continental explains nearly five years of conduct indicating the contrary, as merely precautionary because it could not

ascertain whether the underlying lawsuit would result in a covered loss. Continental would have the Court believe that only when the underlying lawsuit neared judgment in the fall of 1985 was Continental finally able to make a coverage determination. As early as December 1980, however, Continental had in its possession a copy of the complaint in the underlying lawsuit which it now claims is readily recognizable as "purely and simply one of unlawful racial segregation." At that point, Continental can be charged with the knowledge that the Board was defending segregation claims, and Continental's conduct over the following five years is persuasive evidence that the subject policy should be construed to provide coverage of the costs of defense although not the costs of desegregation.

This conclusion is fortified by a number of admissions by Continental executives that confirm this construction of the BEL policy. In a February 1982 internal memorandum unrelated to this case, Continental's Manager of Professional Liability Claims described its own BEL policy as a "patchwork of various coverage endorsements, some of which contradict each other." The Assistant Vice President in charge of Professional Liability Claims commented, in a September 1983 internal memorandum also unrelated to this case, that the BEL policy does "provide coverage for costs of investigation and defense of legal actions surrounding [discrimination] claims." An insured lay person of reasonable intelligence would also understand this to be so.

This Court need not reach the issue of estoppel, based on the same conduct giving rise to a practical construction of the insurance contract, in finding coverage for defense costs. The Board argued, in the alternative, that it detrimentally relied on Continental's representations as to coverage and therefore Continental should be estopped from disclaiming coverage.[6] To

---

6. Detrimental reliance is an element of any estoppel. The Court might speculate that the Board would have retained less expensive local counsel having no travel costs if it knew, as is now claimed, that there was no coverage for the

costs of defense. Possibly an additional full time assistant corporation counsel could have been employed to defend the action. All this is mere speculation. The Board could not have settled the case without the participation of the

the extent the Court has reviewed the letters and related submissions on this motion, it was solely to ascertain evidence of the parties' practical construction of the insurance contract. Such evidence, in the form of Continental's own records and correspondence, is in the nature of an admission.

■ The Court concludes that the Board has fulfilled all conditions precedent to its rights under the policy including the requirement that the Board keep Continental informed of the progress of the underlying lawsuit. Continental's own "file activity sheet" reflects numerous telephone communications between it and the Board. At least two face-to-face meetings were held, two status reports filed, and two fee summaries submitted during the years 1981–1985. The Board cooperated fully and at significant expense with Continental's comprehensive audit of the fees, expenses and costs incurred by the Board in the underlying lawsuit. On the current record, it is clear that the Board has complied with the requirement of reasonable cooperation.

With respect to the Board's contention that Continental breached its contemporaneous duty to pay defense costs to the Board during the pendency of the underlying lawsuit, the Court finds that no such duty has arisen here. The Board claims support for its position in the case of *Pepsico, Inc. v. Continental Casualty Co.*, 640 F.Supp. 656 (S.D.N.Y.1986), which imposed a contemporaneous reimbursement duty on the insurer under a "directors and officers" policy. Unlike that policy, however, the BEL policy contains a provision on costs, charges and expenses which reads as follows:

"(b) The Insurer may at its option and upon request, advance on behalf of an Assured, and/or the School District fees, costs and expenses which have been incurred in connection with claims made against an Assured, prior to disposition of such claims, provided always that, in the event it is finally established the Insurer has no liability hereunder, each agrees to repay to the Insurer, upon demand, all monies advanced on their behalf pursuant to this provision."

■ Read fairly and in accordance with its plain meaning, this provision makes payable Continental's obligation to indemnify defense costs at the earlier of the date of disposition of the claim against the insured or the date of determination of the insurer's liability under the contract of insurance. This is so because the denial of liability in this case constitutes an anticipatory breach of the contract of insurance and entitles the Board to have its damages for breach of contract assessed and awarded. Another court construing the identical provision under different circumstances found that the insurer must pay attorneys fees incurred in defending the underlying cases when those fees are billed. *Okada v. MGIC Indem. Corp.*, 608 F.Supp. 383, 387 (D.C.Haw.1985).

■ This Court, now having ruled that Continental is liable under the insurance contract, finds that money damages for breach of its obligation to pay reasonable and necessary defense costs through the end of the lawsuit and appeals, but not in excess of the policy limits, is due and owing. Under the doctrine of anticipatory breach, if one party to a contract repudiates his duties thereunder prior to the time designated for performance, the non-repudiating party is entitled to claim damages for total breach. *Long Island Railroad Co. v. Northville Industries Corp.*, 41 N.Y.2d 455, 463, 393 N.Y.S.2d 925, 362 N.E.2d 558 (1977). Prejudgment interest will accrue on Continental's obligation effective thirty days from issuance of this Memorandum and Order, since this Court finds that thirty days is a reasonable time within which to audit vouchers and billing statements, estimate the future legal ex-

---

co-defendants, and would have been remiss in its duty if it merely defaulted. While the Court understands that, but for the actions of Continental indicating coverage, the Board could

have budgeted its defense costs annually over the last five years with less budgetary impact, on the whole record there is no detrimental reliance made out here.

penses to the extent they do not exceed the coverage, and to tender payment.

 The Board has requested summary judgment on Continental's liability under the 1978–1981 and the 1981–1984 policies, both placed in issue in the complaint in this action. However, the claim against the Board for which it is seeking defense coverage was made within the first policy period. The underlying lawsuit was filed in December 1980 and notice of that claim was given to Continental the same month. Under a "claims made" policy, such as the one in dispute here, the right to coverage is furnished only by the policy in existence at the time the claim initially was made. In addition the policy states: "the Retention and Limit of Liability applicable is that Retention and Limit of Liability in effect at the time the claim is made." Thus, the Board's right to coverage for defense costs is governed by the first policy and cannot exceed $3,000,000, less $2,500.00.

As the Board notes in its motion for summary judgment, the issue of damages must be reserved for trial. The legal fees and expenses incurred in the underlying lawsuit, alleged to exceed $3,000,000, are attributable to services rendered for all three defendants in the underlying lawsuit. Insurance coverage under the policy exists only for the Board. Issues of fact remain as to the Board's fair share in those defense costs and their reasonableness.

 The complaint in this action asserts a simple breach of an insurance contract. Under New York law, punitive damages may not be awarded in breach of contract cases which involve only private wrongs. *Halpin v. Prudential Ins. Co. of America*, 48 N.Y.2d 906, 908, 425 N.Y.S.2d 48, 401 N.E.2d 171 (1979). That the plaintiff in a contract action is a public governmental entity, such as the Yonkers Board of Education, does not entitle it to punitive damages in a breach of contract case. "There must be fraud aimed at the public generally, evincing a high degree of moral turpitude, and demonstrating such wanton dishonesty to imply a criminal indifference

to civil obligations." *Durham Industries, Inc. v. North River Ins. Co.*, 673 F.2d 37, 40 (2d Cir.1982) (citations omitted); *see also Brinks Inc. v. City of New York*, 717 F.2d 700, 705 (2d Cir.1985). The Court finds that no such wrongdoing aimed at the public is evident in Continental's conduct in disclaiming coverage in this case.

The Board's motion for summary judgment declaring that defense coverage exists under the first policy is granted, with the issue of damages reserved for trial. The Board's motion is denied in all other respects.

Continental's motion to dismiss the claim for punitive damages is granted. In all other respects Continental's motion is denied.

The conclusions of the Court expressed above do not lend themselves to the entry of an interlocutory judgment, nor do they support a finding of the sort contemplated by Rule 54(b), F.R.Civ.P. Counsel are directed to conduct an office conference forthwith to see if they can settle the controversy in light of the foregoing decision. If this desirable result cannot be obtained for any reason, then counsel should seek, without admitting liability, to stipulate to the total amount of the costs of investigation and legal defense of the underlying lawsuit, reasonably and necessarily incurred and to be incurred, solely on behalf of the insured, excluding services rendered to the co-defendants, in order that a final judgment may enter. Failing that, the Court will undertake to try the remaining issues in a prompt fashion.

A status conference will be held on December 15, 1986, in Courtroom 31 at the White Plains Courthouse at 3:30 p.m.

So Ordered.