**GOLDEN EAGLE LIBERIA, LIMITED, Plaintiff,**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant.**

**No. 86 Civ. 3759 (MBM).**

United States District Court, S.D. New York.

May 3, 1988.

Richard Ashworth, Haight Gardner Poor & Havens, New York City, for plaintiff.

John Nicoletti, Donovan Maloof Walsh & Repetto, New York City, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

This case arises from a contract of liability insurance covering, *inter alia*, the voyage of the Claudio R with a cargo of crude oil from the Persian Gulf to St. Romuald, Quebec in January—March 1976. Plaintiff was the charterer of the vessel and operated a refinery in Quebec; defendant was the liability insurer. Now before the Court are cross-motions for summary judgment raising the issue of whether the Claudio R's besetment in ice as it approached St. Romuald in March 1976 was an "accident" within the meaning of the policy. Because I agree with plaintiff that it was, plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied.

## I.   FACTS

The facts set forth below are not disputed.

### A.   *The Policy, the Charter Party and Correspondence From Plaintiff's Broker*

The Claudio R was chartered by plaintiff in January 1976 explicitly for the voyage to Quebec. The cost was higher than the prevailing charter rate, apparently as a premium to the owner for undertaking the winter voyage.

At the time of the charter there was in force a charterer's liability policy written by defendant. That policy incorporated the following language from the form drafted decades before by Johnson & Higgins, plaintiff's insurance broker:

"This insurance covers the legal and/or contractual liability of the Assured as Charterer ... in respect of the Vessel insured hereunder for any loss, damage and/or expense, including but not limited to demurrage and/or removal of wreck and/or Collision Liability and/or any other consequential loss, or damage, resulting from any accident in which said vessel may be involved."

In addition, an attachment to the policy set a deductible amount of $25,000 "in respect of claims other than damages resulting from contact with ice"; the deductible amount for ice damages was set at "$50,000 any one occurrence, each vessel. Ice damages sustained by a vessel while at or proceeding to or from a single port shall be deemed to have resulted from a single occurrence."

Soon after the policy was negotiated, plaintiff's insurance agent wrote a letter to plaintiff purporting to describe the difficulty encountered in securing ice damage insurance because of the charterer's history of substantial ice damage claims resulting from voyages to Quebec. London underwriters, who had borne the burden of such claims, sought higher premiums and "were offering coverage solely for liability as provided under Ice Damage Clauses usually found in tanker charter parties." American underwriters were said to be more moderate in their premium and deductible demands, but to have offered coverage "similar to that offered in the English mar-

ket as a practical matter." The letter then urged plaintiff to send the insurance agent copies of all charter parties in use at the time, and continued:

> Going one step beyond this, I can imagine a situation where delivery of an oil cargo to Quebec might be quite important to keep the refinery working. If the shipowner were to exercise its privilege of discharging at another port which was ice free, it is quite possible that Ultramar might wish to assume additional responsibility for the consequences of ice damage in order to induce the shipowner to force ice and take the vessel into Quebec. This could be done in writing or orally, and the effect would be the same. Since this may involve certain legal questions and be required on relatively short notice, you might wish to have us develop quotations at this time for the additional cost to insure this exposure under primary and excess Charterer's Liability insurance. Please let me know if anything should be done.

The charter party was one of several standard forms then in use and included clauses dealing with inaccessibility of a port, or danger of remaining in port, due to ice. In the former case, although the vessel was to be directed according to the master's judgment, it was bound to notify the charterer, which was then bound to designate an alternative port. In the latter case, the master was obligated to notify the charterer, which could then either designate an alternative port, or direct the vessel to remain where it was at the risk of the charterer.

### B. *The Voyage and Besetment of the Claudio R*

On February 26, 1976, the Claudio R was about 1,500 miles from Cabot Strait when it received an ice forecast from Ice Central Halifax. The forecast—"closed pack new," "gray" and "white" ice—led the master, who had no experience navigating in ice and apparently as much enthusiasm for doing so, to request by radio that the charterer designate "an alternative port or change of port of discharge" pursuant to the ice clause in the charter party, notwith-

standing that he was still about a week's distance from his destination. The charterer refused, and directed the master to continue to the specified destination. On March 2, 1976, following receipt of an updated ice forecast, the master reiterated his request and got the same response—along with the comment that the St. Romuald port facility was fully operational and open to vessels that proceeded pursuant to instructions from Ice Central.

The Claudio R pressed reluctantly onward. After encountering difficulties on March 4, the vessel became stuck fast in the ice on March 5, where it remained for six days. Frequent communications among the vessel, its owner and the plaintiff beginning on March 4 did not yield an alternative port designation. An icebreaker escorted the Claudio R to open water on March 12, and the vessel sailed to Halifax to refuel and undergo inspection and repair before completing the voyage to Quebec under the guidance of an ice pilot and discharging its cargo on March 26.

### C. *Arbitration*

On March 24, 1976, the owner of the Claudio R notified the charterer, plaintiff in this case, of claimed damages for sand blasting and painting damaged hull plates, port expenses, time lost and fuel consumed as a result of the besetment. The claim for port expenses, time and fuel was arbitrated and the ship owner awarded $222,357.31, consisting of the claimed damages plus interest to the date of the award, October 26, 1984. In addition, the plaintiff paid the arbitrators $3,825 each, and paid its counsel in the arbitration $35,859.18, for a total of $269,691.49.

## II. DISCUSSION

### A. *Appropriateness of Summary Judgment*

█ To be sure, even if both parties cross-move for summary judgment, that does not necessarily mean there is no issue of material fact to be tried. *Home Ins. Co. v. Aetna Casualty & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976) (per curiam); *see*

10 Wright and Miller, *Federal Practice and Procedure* § 2720 (1983). "[C]ross-motions for summary judgment do not warrant the granting of summary judgment unless the Court finds that 'one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed.' " *Bollenbach v. Monroe-Woodbury Cent. School Dist.*, 659 F.Supp. 1450, 1456 (S.D.N.Y.1987) (*quoting Frouge Corp. v. Chase Manhattan Bank*, 426 F.Supp. 794, 796 (S.D.N.Y.1976)).

In *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4 (2d Cir.1983), Judge Kaufman discussed particular problems associated with summary judgment as to coverage under an insurance policy. He concluded that "where contract language is susceptible of at least two fairly reasonable meanings, the parties have a right to present extrinsic evidence of their intent at the time of contracting," *id.* at 9, although it bears emphasis that the motion in *Schering* was made before discovery, *id.* at 10, and thus the presentation of extrinsic evidence there discussed could occur as part of a summary judgment motion after discovery, not necessarily at trial. He added that "[s]ummary judgment is perforce improper if conflicting evidence is adduced," *id.* at 9, but in *Wards Co., Inc. v. Stamford Ridgeway Associates*, 761 F.2d 117 (2d Cir.1985), the same author made it plain that the search for "fairly reasonable" interpretations is not an invitation to find ambiguity where none really exists. Most particularly, it is not an invitation to "ignore the conventions of a given commercial setting," *id.* at 120, a *caveat* that is especially relevant in this case.

Applying these principles, I have concluded that although the parties' papers abound with dispute over which facts are material and, occasionally, over whether certain non-material facts exist, the papers do not reflect dispute as to material facts or as to reasonable conclusions to be drawn from such facts. Accordingly, summary judgment is appropriate.

### B. Was Besetment An "Accident"?

■ Defendant insurer argues that the Claudio R's besetment was no accident, and proffers various definitions of "accident" that appear to exclude anticipated consequences [1]. Thus defendant insists that an accident is an event that must be "unforeseen and unexpected," *Guerdon Industries, Inc. v. Fidelity & Casualty Co. of New York*, 371 Mich. 12, 123 N.W.2d 143, 147 (1963); *see also*, Rhodes, 10 *Couch on Insurance 2d* § 41.9 (rev. 2d ed. 1982), one that " ' "takes place without one's foresight or expectation," ... [t]hat is, an unexpected, unfortunate occurrence.' " *Michaels v. Mutual Marine Office, Inc.*, 472 F.Supp. 26, 29 (S.D.N.Y. 1979) (Weinfeld, J.) (quoting *Arthur A. Johnson Corp. v. Indemnity Ins. Co.*, 7 N.Y.2d 222, 228, 196 N.Y.S.2d 678, 164 N.E.2d 704 (1959), quoting *Croshier v. Levitt*, 5 N.Y.2d 259, 269, 184 N.Y.S.2d 321, 157 N.E.2d 486 (1959)). Defendant goes so far as to claim that an "accident" is an event that must take place "without negligence." *Albuquerque Gravel Products Co. v. American Employers Ins. Co.*, 282 F.2d 218, 220 (10th Cir.1960).

Defendant argues that because plaintiff charterer refused to designate an alternative port before the Claudio R was stuck in the ice on March 5, the liabilities incurred from then on may not be considered to have resulted from an "accident" covered by the policy. Defendant argues that once ice became an imminent problem and potential hazard, it was no longer "unforeseen" or "unexpected" that the Claudio R would become beset, and therefore besetment was not an accident. Defendant cites the opinion of a majority of the arbitrators to the effect that the plaintiff's refusal to designate an alternative port was "slavish" as proof that the besetment was a consequence of plaintiff's conduct and was no accident. However, the arbitrators did not apply that undoubtedly pejorative yet strangely inappropriate adjective to any conduct of the plaintiff charterer *before* the Claudio R was beset, but only to its failure

---

**1.** The parties agree that New York law controls. Absent a well-established federal admiralty rule, state law governs the interpretation of marine insurance contracts. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.* 348 U.S. 310, 316–21, 75 S.Ct. 368, 371–74, 99 L.Ed. 337 (1955).

to designate an alternative port *after* besetment, by which time the accident—if besetment was an accident—had already occurred. Since the "central issue" as described in defendant's own brief is "whether the *besetment in ice* of the Claudio R was the result of an 'accident' within the meaning of both the policy and the parties' intent when entering into the insurance contract," (Def. Br. 2/12/88 at 3) (emphasis added), the arbitrators' epithet was not only inapposite but also irrelevant.

The weakness in defendant's various definitions of "accident" and in its position generally is that defendant takes no account of the "commercial setting," *Wards Co., Inc. v. Stamford Ridgeway Associates, supra,* in which the insurance policy was procured and the events later unfolded. As a result, the definitions defendant proffers of what constitutes an "accident" prove far too much. Plaintiff was, after all, a charterer that operated a refinery in Quebec to which it regularly shipped oil. Quebec was a destination where one may expect to encounter ice during various seasons of the year. The hazards posed by ice were at once among the prime reasons for plaintiff's purchase of the subject policy in the first place, and specifically provided for in that policy. Indeed, the defendant insurer, apparently because of the plaintiff's claim history with other insurers, took care to provide a deductible rate for liability resulting from ice hazards that was double the rate for other potential sources of liability. Thus, in a general sense, the hazards of ice were neither "unforeseen" nor "unexpected." Yet one surely cannot argue from that to the conclusion that liability resulting from an encounter with ice is not an "accident." If such reasoning were valid it would mean that any risk anticipated and insured against would, because of its having been anticipated, be ineligible for treatment as "unforeseen" or "unexpected," and therefore ineligible also for treatment as an "accident." By definition, the only "accidents" in such an insurer's paradise would be those that involved uninsured risks.

Common sense compels the conclusion that "accident" must embrace something more than abstract notions of the "unforeseen" and "unexpected." In fact, law and logic are consistent; cases whose relevance both sides acknowledge make it plain that this dispute turns on the question of whether an insured may take a calculated risk without forfeiting the right to have an adverse outcome treated as an "accident." Those cases hold that it may. The leading case is *Messersmith v. American Fidelity Co.,* 232 N.Y. 161, 133 N.E. 432 (1921), in which the New York Court of Appeals held that insurance for liability resulting from a motor vehicle accident would cover liability from a mishap that occurred when the insured permitted an under-age driver to borrow the vehicle. In an oft-quoted formulation, Judge Cardozo wrote that, "Injuries are accidental or the opposite for the purpose of indemnity according to the quality of the results rather than the quality of the causes." *Id.* at 165, 133 N.E. 432. Which is to say, intended causes may have accidental results. He offered the examples of a driver who turns to the wrong side of the road in the erroneous belief that his path is clear, and the occupant of a dwelling who leaves on the window sill a flower pot later dislodged by the wind onto an unlucky passerby, *id.* at 166, 133 N.E. 432, both examples involving voluntary and risky behavior with unintended, and therefore accidental, consequences.

*Messersmith* was later applied in *McGroarty v. Great American Ins. Co.,* 36 N.Y.2d 358, 368 N.Y.S.2d 485, 329 N.E.2d 172 (1975), where the New York Court of Appeals held that when a property owner persisted in constructing a building even in the face of specific warnings, backed by evidence, that the weight of the project would damage neighboring property, the damage that resulted when those warnings came true was nonetheless the result of an accident. The Court found that the insured, knowing that its conduct "might lead to some eventual damage ... nevertheless took the calculated risk that such would not eventuate...." *Id.* at 364, 368 N.Y.S.2d 485, 329 N.E.2d 172. But the result was an accident under the policy absent evidence that the insured "intended

that plaintiff's building should, as a result, incur the damage which did eventuate." *Id.* The same principle was applied in *Continental Ins. Co. v. Colangione*, 107 A.D. 2d 978, 484 N.Y.S.2d 929 (3rd Dep't 1985), where the court held that to deny accident coverage a fact finder "must find that the insured intended to cause damage," *id.* at 979, 484 N.Y.S.2d at 931, and that a "calculated risk" does not "amount to an expectation of damage." *Id.*

■ Those principles compel a judgment for plaintiff here. As the Claudio R approached Quebec, besetment was a risk but by no means a certainty. It is not contested that other vessels reached St. Romuald at the same time the Claudio R had its less happy and successful experience, and that the vessel did manage to reach its destination under the guidance of an ice pilot after it took on fuel at Halifax. In these circumstances, even considering that plaintiff bears the burden of proving that its loss comes within the coverage afforded by the policy, *Cary v. Home Insurance Co.*, 235 N.Y. 296, 299–300, 139 N.E. 274 (1923), the record will not support an argument that plaintiff's refusal to designate an alternative port of discharge before the Claudio R's besetment betrayed an intent to cause damage, *Continental Ins. Co. v. Colangione, supra*, or anything like it. Rather, the charterer took a "calculated risk," *id.*, 107 A.D.2d at 979, 484 N.Y.S.2d at 931, and *McGroarty v. Great American Ins. Co., supra*, that it had good reason to believe would not result in damage. The disappointment of such well-founded hopes is no less an accident than is some utterly unanticipated cataclysm, and coverage is not forfeited as a result.

### C. *Defendant's Other Arguments*

■ Nothing in defendant's other arguments changes the above conclusion. Defendant has urged that cases such as *Messersmith* and *McGroarty* involved negligence and are inapplicable here because the breach of the charter party by failure to designate an alternative port was willful, not negligent. Assuming *arguendo* that it was, defendant's argument is still unavail-ing, because whether or not the breach of contract was willful, the besetment—the accident—was not, and defendant has offered no evidence to suggest otherwise. The policy recites specifically that it covers "the legal *and/or contractual liability*" of the charterer (emphasis added). Thus a breach of contract resulting in an accident is covered.

■ At oral argument, defendant invoked the hallowed rule that a marine insurance contract is *uberrimae fidei*—of the utmost good faith, and suggested that to take a "calculated risk," *McGroarty v. Great American Insurance Co., supra*, is a violation of that rigorous standard. First, that standard applies primarily to the accuracy and sufficiency of facts provided by the insured before the risk is accepted and the premium and conditions set, not to behavior afterward. *See*, Gilmore and Black, *The Law of Admiralty*, § 2–6, at 62 (2d ed. 1975). But further, what the defendant is proposing is a rule that would reverse the roles of insurer and insured, with the latter obligated to protect the former against hazards, rather than vice-versa. I see no evidence of bad faith in plaintiff's conduct here, and no basis for imposing the role reversal implicit in defendant's argument.

■ More generally, defendant contends that any ambiguity in this policy should be construed not against the insurance company, as is often the case, *Ingersoll Milling Machine Co. v. M/V Bodena*, 829 F.2d 293, 306 (2d Cir.1987), *cert. denied sub nom. J.E. Bernard & Co. v. Ingersoll Milling Machine Co.*, —— U.S. ——, 108 S.Ct. 744, 98 L.Ed.2d 860 (1988), but against the insured because the agent of the insured originated the form, incorporated in the policy, in which appears the language defining coverage to include liability resulting from "any accident." The argument is flawed both factually and legally. The form in question, although concededly prepared by plaintiff's broker, Johnson & Higgins, was drafted decades ago and has been in general use for years. Moreover, the *contra proferentem* doctrine defendant invokes is a last resort designed to resolve

ambiguities when all else fails, not a handicap to be entered always on the draftsman's score sheet. *Schering Corp. v. Home Ins. Co., supra*, 712 F.2d at 10 n. 2. There is no need to apply that doctrine here because, even assuming the facts otherwise justified its application, the commercial setting of the transaction as described above would be sufficient to resolve any ambiguity. Finally, even assuming that plaintiff had drafted the disputed language for this contract, and that ambiguity existed, and that other facts did not resolve it, it is questionable whether the *contra proferentem* rule applies at all in a case such as this where two sophisticated parties bargain for a contract. *Id.*, and cases cited therein.

Further, defendant cites a letter from plaintiff's insurance agent to plaintiff shortly after the policy in question was issued as proof that risks such as the besetment of the Claudio R were not covered. The letter confirms that the coverage available to plaintiff was "for liability as provided under Ice Damage Clauses usually found in tanker charter parties." The letter then goes on to propose that plaintiff provide its agent with copies of all charter parties in use. Thus, to the extent that the liability here arose from a clause of the charter party, as did the liability imposed in the arbitration for which plaintiff seeks compensation, and the charter party was one in general use, that language suggests that the policy does cover plaintiff. Defendant points to other language in the same letter, hypothesizing a situation in which the St. Romuald port was substantially blocked by ice and an oil delivery to plaintiff's Quebec refinery was essential to keep the facility running. In such a situation, the plaintiff "might wish to assume additional responsibility for the consequences of ice damage in order to induce the shipowner to force ice and take the vessel into Quebec." The agent then went on to suggest that plaintiff might wish to have him solicit rates for insuring against such an eventuality.

But all that language does is to suggest that plaintiff consider additional insurance in case it decides to agree with a vessel owner to go outside the usual charter party whose risks *are* insured and induce the owner with a promise of indemnification to let its vessel "force ice," [2] and thereby incur a risk that is not insured. Yet there was no forcing of ice in this case, nor any agreement to go outside the charter party and indemnify the vessel owner for undertaking to force ice. The language cited by defendant is irrelevant.

■ Again, defendant has urged strenuously that there is no proof the Claudio R was physically damaged by its encounter with the ice, and therefore there was no "accident" under the policy. To the extent there is any factual dispute about whether the Claudio R was physically damaged, that dispute in irrelevant because the policy in question covers liability of plaintiff "for *any loss*, damage and/or *expense, including but not limited to demurrage … and/or other consequential loss …* resulting from any accident …" (emphasis added). The policy itself does not limit compensation to liability resulting from physical damage, or require physical damage as a prerequisite to other recovery.

Finally, defendant insists it never intended to cover losses due to besetment. Assertions of preferred and, frankly, fanciful interpretations of contract language, *Nipkow & Kobelt, Inc. v. North River Ins. Co.*, 633 F.Supp. 437, 446 (S.D.N.Y.1986) and cases cited therein, and after-the-fact intent, *Board of Education, Yonkers City School District v. CNA Ins. Co.*, 647 F.Supp. 1495, 1505 (S.D.N.Y.1986), *aff'd*, 839 F.2d 14 (2d Cir.1988), are not enough to defeat summary judgment.

## III. CONCLUSION

The besetment of the Claudio R was an accident. The liability that resulted therefrom is covered by the policy at issue. The

---

**2.** Forcing ice, as the term suggests and record testimony confirms, involves attempting to break through solid ice by forcing the hull of a ship through the ice, not attempting to pick the vessel's way through channels in a waterway partially blocked by ice. (Johnson Tr. at 40–41).

plaintiff's motion for summary judgment is granted; the defendant's motion is denied.

SO ORDERED.